United States District Court
Southern District of Texas
**ENTERED**
June 01, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VALENCIA SINGLETON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1121 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 16) and Defendant's Cross-Motion for Summary Judgment (Doc. 12). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II and for Medicare qualified government employee ("MQGE") insurance benefits under

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 9, Ord. Dated July 17, 2017.

Title XVIII of the Social Security Act ("the Act").  Plaintiff subsequently applied for supplemental security income under Title XVI of the Act.

Plaintiff was born on July 6, 1962, and was fifty years old on the alleged disability onset date of August 16, 2012.[2]  Plaintiff, who graduated from high school, worked in elementary education from 1989 to 2012 at different times as a library technician, a secretary, and a teacher's aid.[3]

## A.  __Medical History__

The medical records generally support a history of treatment for fibromyalgia; arthritis; asthma; chronic obstructive pulmonary disease ("COPD"); hypertension; tachycardia; sleep issues; wrist, neck, and back issues; migraine headaches; and other health concerns.[4]  Plaintiff underwent numerous laboratory tests, sleep studies, computerized axial tomography ("CT") and electromyography ("EMG") scan(s), myelograms, electrocardiograms ("EKGs"), myocardial perfusion imaging, magnetic resonance imaging ("MRI"), methylcholine challenge testing, pulmonary function testing, spirometry testing, holter monitoring, chest, spine, feet, knees,

---

[2]     See Tr. of the Admin. Proceedings ("Tr.") 161.  In other documents in the administrative records, the alleged onset date is identified as August 10, 2012.  See, e.g., Tr. 467.

[3]     See Tr. 161, 472, 480-83; but see Tr. 499 (also including personal assistant to the principal and clerk during the same time period but excluding library technician).

[4]     See, e.g., Tr. 471, 556-82, 588-94, 609-14, 667-78, 717-22, 742-45, 750-51, 784-99, 805-35, 912-22, 1127-37, 1148-57, 1170-80, 1188-98, 1254-68, 1333, 1502-33, 1544-54, 1643-46, 1740-45.

hands, and wrists x-rays and a duplex doppler extremity venous ultrasound.[5] She received physical therapy, occupational therapy, and intervertebral differential dynamics therapy ("IDD") and sought treatment at emergency rooms multiple times for chest pains and other complaints.[6] Plaintiff reported that she had not sought any treatment for mental conditions, however her medical records intermittently included diagnoses of depression and anxiety and reflect minimal psychological treatment.[7]

Plaintiff underwent a hysterectomy in August 2012.[8] At an appointment with William Fleming III, M.D., ("Dr. Fleming") in October 2012, Plaintiff reported back pain and spasms but no neck or joint pain.[9] The doctor noted that an MRI of Plaintiff's lumbar spine revealed multilevel degenerative changes.[10] On examination, Dr. Fleming observed no decreased range of motion, no abnormal movements, no bruit auscultation on either side, no palpable mass

---

[5] See, e.g., Tr. 604-07, 619-20, 645-55, 659, 661-63, 686-716, 723-31, 735-39, 746-49, 755-56, 768-69, 827-828, 832, 857-64, 868-75, 915-19, 938-39, 958, 997-1019, 1042-45, 1051-63, 1007-82, 1085-96, 1108, 1140, 1154-56, 1165, 1167-69, 1175-76, 1184-87, 1228-31, 1287-90, 1311-16, 1368, 1405-56, 1516-17, 1526-31, 1550-53, 1577-82, 1605-11, 1613-15, 1647-63, 1731-33, 1738 1743-44, 1770-86, 1809-11, 1814-16, 1818-24, 1879-82, 1885-1906, 1913-17, 1924-30, 2013-2028, 2040-41, 2046-50, 2051-67, 2072-76.

[6] See, e.g., Tr. 732-39, 765-78, 852-64, 899-912, 981-87, 1037-41, 1046-51, 1063-73, 1479-83, 1636-42, 1907-30, 2041-47, 2049-50, 2052-55, 2057-62, .

[7] Compare Tr. 474 with 750-51, 1555-59, 1759-68, 1787-1800.

[8] See Tr. 556-79.

[9] See Tr. 609.

[10] See id.

3

on either side, and no tenderness.[11]   He ordered a course of IDD (computerized traction), which Plaintiff failed to complete.[12]   At an appointment with Dr. Fleming a month later, Plaintiff reported that her back pain had improved significantly with IDD therapy but that she had begun to experience severe neck pain.[13]   An MRI taken earlier in the month did not show significant abnormality, significant adenopathy, or stenosis but did reveal mild diffuse annulus bulges and "disc space narrowing extending from C3 to C7 level with degenerative endplate changes and mild reversal of for [sic] normal cervical lordosis."[14]

During the years 2013 to 2015, Plaintiff had at least 120 medical appointments, which included tests and therapy as well as appointments with doctors.[15]   In February 2013, a brain CT revealed nothing abnormal, and a chest x-ray was normal.[16]

On May 13, 2013, Plaintiff was seen by Dr. Fleming, who observed tenderness and decreased range of motion but no abnormal movements, no bruit auscultation on either side, no palpable mass on either side.[17]   He recorded no mental or cognitive impairments

---

[11]   See Tr. 610.

[12]   See Tr. 591, 611.

[13]   See Tr. 595.

[14]   Tr. 1879-80; see also Tr. 595.

[15]   See Tr. 580-683, 686-837, 851-1542, 1544-1665, 1719-1879, 1883-2799.

[16]   See Tr. 859-60.

[17]   See Tr. 588-90.

and referred Plaintiff for pain management.[18]  Plaintiff was seen on the same day by Tamika Denson-Willis, M.D., ("Dr. Denson-Willis") at the offices of Anil A. Dara, M.D., P.A.[19]  Plaintiff reported that she had had a neurological consultation with Dr. Fleming and was at Dr. Denson-Willis's office for treatment of hypertension and pain in the arms and legs.[20]  Dr. Denson-Willis diagnosed Plaintiff with hypertension and prescribed medication.[21]

On May 17, 2013, Plaintiff typed a letter to Dr. Fleming in response to a medical statement he provided for Plaintiff's long-term disability insurer.[22]  According to Plaintiff's letter, Dr. Fleming stated that Plaintiff "could have or could work during the period November 30th on up to today's date."[23]  Plaintiff continued, "To my understanding you and the person(s) at [the insurance company] decided that from the Job Description of the previous job that I no longer have (School Secretary), that I could perform my duties as required."[24]  Plaintiff explained that she had not continued with physical therapy, not because her back was better,

---

[18]    See Tr. 589-90.

[19]    See Tr. 677-78.

[20]    See Tr. 677.

[21]    See id.

[22]    See Tr. 2089-90.

[23]    Tr. 2089.

[24]    Id.

but because she could not afford it.[25]  In fact, she said, the pain was worse, and she urged Dr. Fleming to reconsider his medical statement so that her long-term disability benefits could be reinstated.[26]

Tests performed at an examination by Pawan Grover, M.D., ("Dr. Grover") on May 22, 2013, were positive for pain, tenderness, inflammation, and decreased range of motion in her back and sacroiliac joint but negative for abnormal movement and spasms.[27] Plaintiff exhibited a normal gait and full strength in her extremities.[28]  Dr. Grover recorded Plaintiff's reports of memory issues and anxiety symptoms but indicated that he found no psychological issues.[29]

Plaintiff underwent sleep studies in June 2013, which resulted in diagnoses of obstructive sleep apnea syndrome and periodic limb movement disorder; the treatment provider recommended that she use a continuous positive airway pressure ("CPAP") machine.[30] Plaintiff returned to Dr. Denson-Willis thrice in June and twice in July, ultimately requesting that Dr. Denson-Willis complete disability

---

[25]    See Tr. 2090.

[26]    See id.

[27]    See Tr. 580-81.

[28]    See Tr. 580.

[29]    Id.

[30]    See Tr. 645-55, 659.  Medical records dated December 5, 2013, and February 10, 2015, indicated that Plaintiff had not obtained or begun using a CPAP machine.  See Tr. 718, 1503-04.

forms for her long-term disability insurer.[31]  At that appointment, Dr. Denson-Willis added fibromyalgia, obstructive sleep apnea, and degenerative disc disease to the original diagnosis of hypertension.[32]

Plaintiff was seen twice in December 2013 for pain and numbness in her right arm; one record noted no atrophy and normal muscle tone and the other noted normal range of motion and no swelling.[33]  At the second appointment, Plaintiff reported that she was not experiencing any medication side effects but that she had experienced one occasion when the fibromyalgia pain was "so severe that she could not get out of the bed."[34]  In early 2014, Plaintiff attended several physical therapy sessions, and the notes reflected that she demonstrated a full range of motion but expressed fatigue and reported that she did not complete the home exercises.[35]

Carpal tunnel syndrome ("CTS") was mentioned a physician's note dated March 24, 2014, which stated that Plaintiff was "[n]ot really having [CTS]."[36]  In May 2014, another doctor stated that he could not "offer [Plaintiff] surgery . . . as her symptoms d[id]

---

[31]   See Tr. 667-76.

[32]   See Tr. 667.

[33]   See Tr. 793, 742-45.

[34]   Tr. 792 (internal quotation marks omitted).

[35]   See Tr. 732-39, 1037-41.

[36]   Tr. 1482.

not fit the clinical picture of CTS and her EMG results [were] equivocal."[37]  Plaintiff told the doctor that she was not interested in further therapy or injections.[38]

Plaintiff's primary care physician, Humaira Abid, M.D., ("Dr. Abid") noted at a July 2014 appointment that Plaintiff's hypertension was controlled, that her myalgia exam was normal, that a myocardial perfusion scan was normal, and that her COPD was stable except for intermittent cough.[39]  In August 2014, a doctor saw Plaintiff for arm pain and recorded that a recent MRI showed mild edema but, "[o]therwise, no abnormalities in the right forearm and visualized wrist and elbow."[40]

At an appointment with Dr. Abid in late October 2014, Plaintiff again reported that she was not experiencing any side effects from her medication.[41]  Dr. Abid referred Plaintiff to the geriatric department for memory care, and, in December 2014, a geriatric nurse practitioner assessed Plaintiff.[42]  The nurse practitioner recorded that a depression screen was negative and a cognitive screen was positive for impairment/dementia.[43]

---

[37]     Tr. 1468.

[38]     Id.

[39]     See Tr. 1157.

[40]     Tr. 1805.

[41]     See Tr. 1106.

[42]     See Tr. 1520, 1524.

[43]     See Tr. 1520.

In February 2015, the physical therapist noted Plaintiff's positive response to treatment at two sessions and noted "[g]ood [m]otivation" and "[g]ood [s]ocial [s]upport," concluding that Plaintiff's prognosis was fair to good.[44]   In April 2015, Dr. Abid recorded that Plaintiff was experiencing no side effects from her medication and her fibromyalgia was "[f]air stable" but she was suffering from a persistent cough for approximately three weeks.[45] He also reviewed the report of a recent chest x-ray, which identified no acute cardiac or pulmonary pathology.[46]

At geriatric appointments in April and May 2015, the treating provider noted that he explained Plaintiff's laboratory results, which were all normal.[47]   At both appointments, Plaintiff denied changes in her medical condition and stated that she was able to perform activities of daily living ("ADLs") on her own but did not drive, manage her finances, or shop.[48]

At an appointment on December 21, 2015, Dr. Abid's assessment was that Plaintiff's cough was seasonal; that a chest x-ray was normal; that Plaintiff's blood pressure was at goal; that physical therapy would improve the chronic lower back pain;  and that

---

[44]   See Tr. 1638, 1641.

[45]   See Tr. 1550-54.

[46]   See Tr. 1550-51.

[47]   See Tr. 1757, 2231.

[48]   See Tr. 1753.

Plaintiff's fibromyalgia could be treated with continued medication.[49] The doctor's notes stated that Plaintiff was positive for myalgias, pain, and cough and that she was negative for fatigue, headaches, tenderness, edema, shortness of breath, abdominal pain, sleep disturbance, and nervousness/anxiety.[50] The physical and mental status examinations were normal.[51]

## B.  **Application to SSA**

On July 1, 2013, Plaintiff filed an application for disability and MQGE insurance benefits claiming an inability to work since August 16, 2012, due to fibromyalgia, arthritis, hypertension, and a bone spur in her back.[52] On September 23, 2013, Plaintiff filed an application for supplemental security income.[53]

On October 27, 2013, Plaintiff completed a function report in which she reported that she suffered from fibromyalgia, sleep apnea, narcolepsy, degenerative disc disease with a bone spur, migraine headaches, and tachycardia, but that she was not receiving any treatment for these conditions due to the lapse of medical

---

[49]    See Tr. 2310-13.

[50]    See Tr. 2310.

[51]    See id.

[52]    See Tr. 440, 471.

[53]    See Tr. 444.

insurance.[54]  Later in the report, Plaintiff also mentioned CTS.[55]

    In describing a usual day, she stated:

> I wake up[,] oversee my grandkids, to get ready for
> school[;] I have a breakfast drink, if my body is acting
> okay, will try to do lite [sic] cleaning or ministry work
> via phone, take care of personal business matters via
> phone.  [I] [h]ave/fix lite [sic] lunch, sandwich, then
> usually the nar[c]ole[ps]y occurs at some point during
> the day.[56]

Plaintiff stated that she had "No Problem" bathing, caring for her

hair, shaving, feeding herself, or using the toilet but that her

conditions "Sometimes" affected her ability to dress.[57]  Plaintiff

did not drive, asserting that she had been advised not to drive due

to narcolepsy.[58]  She reported going out of her residence two to

three times a week, shopping "maybe once a week."[59]

    As far as social activities, Plaintiff reported significant

involvement with her faith congregation, which included writing

letters, witnessing by telephone, and attending services twice a

week as she could.[60]  Plaintiff marked the following as affected by

her conditions:  lifting, squatting, bending, standing, walking,

sitting, kneeling, stair climbing, remembering, concentrating,

---

[54]  <u>See</u> Tr. 489, 496.

[55]  <u>See</u> Tr. 494.

[56]  Tr. 490.

[57]  <u>Id.</u>

[58]  <u>See</u> Tr. 492.

[59]  <u>Id.</u>

[60]  <u>See</u> Tr. 493.

understanding, and using hands.[61]   Plaintiff indicated that she
could lift no more than ten pounds, stand for no more than a few
minutes, and climb no more than a flight of stairs, but she was
unsure how far she could walk before needing rest, stating only
that, if she rested for one to three minutes, she could resume
walking.[62]   Plaintiff reported no effect on her mental abilities,
other than remembering and concentrating.[63]  She indicated that she
avoided stress in an effort to control her blood pressure.[64]

In a work history report completed a few days later, Plaintiff
added the following remarks:

> My medical condition(s) after my surgery [hysterectomy]
> continued to esc[a]late[;] I was not able to function as
> a school secretary and do things that were required of
> me.  My problems were reported[] but never investigated
> to see what the cause could be.  My health has continued
> to decrease.  After finally get[ting] the proper medical
> care, I was diagnosed with fibromyalgia, [o]bstructed
> [s]leep [apnea], along with the many back pain problems.
> My doctor has been having a time trying to keep my
> el[e]vated heart rate down under 100.   My health
> condition has been ongoing but help for it has been . .
> . put on hold due to not being able to get medical
> help.[65]

On November 19, 2013, the SSA found Plaintiff not disabled at

---

[61]   See Tr. 494.

[62]   See id.

[63]   See Tr. 494-95.

[64]   See Tr. 495.

[65]   Tr. 504.

12

the initial level of review.[66]   Frederick Cremona, M.D., ("Dr. Cremona") reviewed Plaintiff's medical record and completed a Residual Functional Capacity ("RFC") assessment.[67]   He concluded that Plaintiff occasionally could lift and/or carry twenty pounds; frequently could lift and/or carry ten pounds; could stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; could sit (with normal breaks) for about six hours in an eight-hour workday; and could push and/or pull (including operation of hand and/or foot controls) without limitation other than those imposed for lifting and carrying.[68] As far as postural limitations, Dr. Cremona opined that Plaintiff was capable of frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling but only occasionally climbing ladders/ropes/scaffolds.[69]   Dr. Cremona found Plaintiff to have no manipulative, visual, communicative, or environmental limitations.[70]

On January 27, 2014, an SSA employee interviewed Plaintiff in person and recorded observing that Plaintiff had no difficulty hearing, reading, breathing, understanding, being coherent, concentrating, talking, answering, sitting, standing, seeing, using

---

[66]   See Tr. 205-22, 251-58.

[67]   See Tr. 209-10.

[68]   Tr. 209, 217.

[69]   Tr. 209-10, 217-18.

[70]   See Tr. 210, 218.

hands, or writing.[71]  The interviewer noted, however, that Plaintiff walked slowly.[72]

On February 11, 2014, Plaintiff completed an updated function report, stating, "My condition is worse.  The weather has played a big level [sic] in pain level.  Pain has increased and is more frequent."[73]  Plaintiff reported that, since December 2013, she had experienced additional limitations in the form of "less use of right arm" and "very limited physical activity."[74]  She also reported the following new conditions since her prior disability report: "severe migraines, c[a]rpal tunnel syndrome[, right] foot and hand numbness and tingles, sleep apnea, depression, bronchitis, over active bladder, lower back problems, degenerative disc disease."[75]

According to Plaintiff, her activity level had declined and, "[s]ome days due to pain and chronic fatigue," she was unable to do anything for herself.[76]  Plaintiff indicated that she was still able to oversee her grandchildren as they dressed for school; prepare herself a breakfast drink and a light lunch; perform light

---

[71]   See Tr. 507.

[72]   See id.

[73]   Tr. 509.

[74]   Id.

[75]   Id.

[76]   Tr. 513.

housework (washing clothes and ironing while seated); conduct personal business by telephone, engage in telephone ministry work; prepare for theocratic ministry school; attend events at her place of worship; and watch television.  She explained that the extent to which she was able to pursue these activities depended on how she felt on a particular day.[77]

Plaintiff reported that she no longer did any shopping.[78] Plaintiff stated that, at times, she could not dress, care for her hair, or wipe herself due to fatigue, lack of energy, weakness, and/or pain.[79]  Regarding physical and mental abilities, Plaintiff reported no changes except that her conditions no longer affected her concentration and that she now experienced difficulty completing tasks.[80]  In the remarks section, Plaintiff stated:

> My health condition(s) have not improved[;] they have gotten worse.  The medications that I am currently taking also effect my daily activities and the ability to function in a normal capacity.  .  .  .  [W]ith my fibromyalgia, the flare-ups are so f[r]equent and the level of pain has increased greatly.  The fatigue [a]ffects me greatly and never knowing in advance when it will . . .[,] how long it will last and how severe.  At times[,] due to the pain and fatigue, I have been in bed for days at a time.[81]

On March 21, 2014, the SSA again found Plaintiff not disabled

---

[77]     See Tr. 517-18, 520.

[78]     See Tr. 519.

[79]     See Tr. 517.

[80]     See Tr. 521-22.

[81]     Tr. 523.

upon reconsideration.[82]   Patty Rowley, M.D., ("Dr. Rowley") completed a physical RFC assessment after reviewing Plaintiff's updated file and concurred with Dr. Cremona's initial assessment in all regards.[83]   Lee Wallace, Ph.D., ("Dr. Wallace") completed a psychiatric review technique, finding that Plaintiff experienced mild restriction of ADLs, mild difficulties in maintaining social functioning and concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration.[84]   Dr. Wallace noted that Plaintiff had no records of treatment or hospitalization for a limiting mental condition and found no record evidence of a mental condition that significantly limited Plaintiff's abilities to attend to her ADLs.[85]

Plaintiff requested a hearing before an ALJ.[86]   The ALJ granted Plaintiff's request and scheduled the hearing on April 23, 2015.[87]

## C. **April 2015 Hearing**

At the hearing, Plaintiff and a vocational expert testified.[88]
Under questioning by her attorney, Plaintiff testified that she

---

[82]   <u>See</u> Tr. 223-50, 261-71.

[83]   <u>See</u> Tr. 231-32, 244-46.

[84]   <u>See</u> Tr. 229-30, 242-43.

[85]   <u>See</u> Tr. 230, 243.

[86]   <u>See</u> Tr. 272.

[87]   <u>See</u> Tr. 356-61.  The hearing was originally scheduled for January 8, 2015, but no testimony was taken because not all records had been submitted.  <u>See</u> Tr. 159, 285-90.

[88]   <u>See</u> Tr. 155-81.

performed her personal chores, including laundry, small meal preparation, and dishwashing.[89]   At the attorney's prompting, Plaintiff described her health issues as follows:

> My health issues are back pain.  Lower back pain as well as upper back pain.  Memory of course.  I've been dealing with that.  Very much -- very much fatigue.  Dealing with fatigue.  And leg pain.  I've been dealing with my leg -- leg pain for some reason.  My [right] arm is starting back to hurt again along my wrist.[90]

Plaintiff also testified that she had been diagnosed with narcolepsy and suffered from migraines.[91]

The attorney asked Plaintiff how her physical conditions affected her functional abilities.[92]  Beginning with the pain in her right wrist, which Plaintiff admitted was temporarily relieved by steroid shots, she stated that the pain caused difficulty in lifting, maneuvering the wrist itself, buttoning, zipping, reaching behind her back, holding a toothbrush, combing or brushing her hair, dropping, grabbing, and twisting.[93]  Plaintiff said that, at times, her asthma caused severe and violent coughing attacks that induced vomiting, which made her reluctant to venture away from home.[94]  According to Plaintiff, the coughing episodes were

---

[89]   See Tr. 162.

[90]   Tr. 163.

[91]   See Tr. 169, 174-75.

[92]   See Tr. 164-75.

[93]   See Tr. 163-66.

[94]   See Tr. 166-67.

17

triggered by smells, such as something burning or a spice and cold weather, and she had, in addition to daily asthma medication, an emergency inhaler, which she relied on daily in the winter but twice a week on average.[95]

Plaintiff said that she could stand for five to ten minutes, could walk a block or two, could lift a loaf of bread with her right hand, and could lift "a gallon of milk or a quart of milk, something like that" with her left hand.[96]  Plaintiff also stated that memory deficits had prevented her from recalling, on occasion, the year, an individual to whom she had given a ride, or the purpose of an excursion.[97]  Plaintiff testified that, as a result, she had begun to write notes to jog her memory.[98]  She expressed concern that her memory would interfere with her ability to be organized at work.[99]

Plaintiff explained that she engaged in ministry work ten to fifteen hours per month but could not perform that work on a full-time basis because the work varied so much.[100]

Sometime [sic] it's just from home on the phone.  The days I can get out[,] I go out but[,] if I feel -- start

---

[95]    See Tr. 167-69.

[96]    Tr. 170-71.

[97]    See Tr. 172-73.

[98]    See Tr. 173.

[99]    See Tr. 174.

[100]   See Tr. 171-72.

feeling really awful[,] I can easily come home and lay [sic] down which is -- I've had to be brought home on several occasions because of the narcolepsy . . . ."[101]

The ALJ turned to the vocational expert, who described Plaintiff's past work as a library technician as light and skilled, as a secretary as sedentary and skilled, and as a teacher's aide as light and semi-skilled.[102]   The ALJ then posed a hypothetical individual capable of light work but who "could only occasionally stoop, crouch, crawl, . . . handle, and balance[] [a]nd frequently but not constantly fine finger and gross handle [with] [n]o climbing ropes, ladders, or scaffolds[,] [n]o working in proximity to hazards such as unprotected heights or dangerous machinery."[103] The vocational expert responded that such an individual could perform all of Plaintiff's prior work.[104]

When the ALJ reduced the amount of standing or walking to three to four hours in an eight-hour workday, the vocational expert limited the hypothetical individual to Plaintiff's past work as a secretary and a teacher's aide.[105]  When the ALJ further limited the individual's abilities to understanding, remembering, and carrying out detailed but not complex tasks, the vocational expert opined

---

[101]    Tr. 172.

[102]    See Tr. 175-76.

[103]    Tr. 176-77.

[104]    See id.

[105]    See Tr. 177-78.

that only the position of teacher's aide would be possible.[106] However, if that individual had to miss three days per month, she would not be able to perform any of the past work, according to the vocational expert.[107]

Plaintiff's attorney inquired whether a hypothetical individual of the same age, education, and work experience as Plaintiff limited to light work who could never use ropes, ladders, or scaffolds; could occasionally use ramps and stairs; could occasionally perform all postural limitations; could frequently use dominant hand/arm; could occasionally finger; and was limited to simple, routine, and repetitive type of work.[108]   The vocational expert said that the individual would not be able to perform any of Plaintiff's past work.[109]   The vocational expert said that the individual with occasional fingering and frequent handling could work as an office helper, a ticket seller, and a garment sorter.[110]

The ALJ ordered an appointment with a neuropsychologist to include a general mental status exam, intelligent quotient ("IQ") testing, and memory testing followed by a mental RFC assessment.[111]

---

[106]   See Tr. 177-78.

[107]   See Tr. 178.

[108]   See Tr. 178-79.

[109]   See id.

[110]   See Tr. 179-80.

[111]   See Tr. 180.

He further ordered appointments with an orthopedic specialist, and an orthopedist followed by a physical RFC assessment.[112]

D.  __Consultative Examinations__

On June 23, 2015, Frank Barnes, M.D., ("Dr. Barnes") interviewed and examined Plaintiff.[113]  An x-ray taken at the appointment revealed slight narrowing at L3-L4, "some extra lordosis," and normal pelvis including hips and pubis.[114]

He opined that Plaintiff frequently could lift and carry up to ten pounds and occasionally could lift and carry eleven to twenty pounds; that she could sit, stand, or walk for two hours each without interruption and could sit, stand, or walk for eight hours total in a workday; that she continuously could operate foot controls with either foot, reach in most directions, handle, finger, feel, push, and pull and frequently could reach overhead with either hand; that she occasionally could climb stairs, ramps, ladders, or scaffolds, occasionally could balance, stoop, kneel, crouch, and crawl; that she continuously could be exposed to dust, odors, fumes, pulmonary irritants, extreme heat, and very loud noises; and that she frequently could operate a motor vehicle and occasionally could be exposed to unprotected heights, moving

---

[112]     See id.

[113]     See Tr. 1698-99, 1703-10, 1700-01.  Although Dr. Barnes' letter is dated June 26, 2015, and stated that doctor saw Plaintiff "today," both the medical source statement and range of motion chart are dated June 23, 2015. Compare Tr. 1700 with Tr. 1699, 1710.

[114]     Tr. 1691.

mechanical parts, humidity and wetness, extreme cold, and vibrations.[115]

Basing his opinions solely on her physical impairments, Dr. Barnes found that Plaintiff could shop; could travel without a companion; could ambulate without a wheelchair, walker, two canes, or two crutches; could walk a block at a reasonable pace on rough or uneven surfaces; could use public transportation; could prepare simple meals and feed herself; could care for her personal hygiene; and could sort and handle paper/files.[116]  Dr. Barnes added hand-written notes stating that Plaintiff demonstrated limited lumbar motion and mildly abnormal balance and that she reported persistent pain and weakness in her shoulders.[117]  In his letter, Dr. Barnes described Plaintiff's affect as anxious, her posture as normal, and the curve of her spine as normal.[118]  The doctor found no list, atrophy, swelling, tenderness, or palpable spasm but noted that Plaintiff's range of motion was mildly limited due to pain, that axial compression caused lumbar pain, and that traction caused neck pain.[119]

On June 30, 2015, David McLendon, Ph.D., ("Dr. McLendon")

---

[115]    See Tr. 1703-09.

[116]    See Tr. 1710.

[117]    See Tr. 1703, 1709.

[118]    See Tr. 1701.

[119]    See id.

examined and administered a full battery of psychological tests.[120]
Plaintiff reported to Dr. McLendon that she spent "her time writing
letters or witnessing on the phone" and "pitter patter[ing] around
the home."[121]  She also stated that she did "some of the cooking and
cleaning," that she could handle her own finances, that she was
able to drive but did not, and that she was able to take care of
all of her personal needs without any assistance.[122]  Plaintiff
indicated good social functioning and a group of friends with no
difficulty in dealing with people of authority.[123]  However, she did
not watch television or keep up with current events.[124]  Plaintiff
reported that she was able to complete tasks in a timely and
appropriate manner although, at times, it was necessary for her to
return later to complete the tasks.[125]  Plaintiff reported no
episodes of decompensation.[126]

A mental status examination was within normal limits except
for Plaintiff's inability to interpret either of two proverbs, to
recall all five digits backward, to count backward from fifty by
sevens, to recall after five minutes all three objects named, or to

---

[120]   See Tr. 1681-87.

[121]   Tr. 1682.

[122]   Id.

[123]   See Tr. 1683.

[124]   See Tr. 1682.

[125]   See Tr. 1683.

[126]   See id.

perform complex math.[127]   Plaintiff's "intelligence testing
indicated that all of her intellectual abilities were consistently
formed and all place[d] her within the borderline range indicating
limitations with regard to her intellectual resources but also
reflecting no areas of significant impairment."[128]   Dr. McLendon
found no indication that Plaintiff had a learning disorder and
found no "specific problems related to memory function" although he
stated that her memory resources were limited.[129]   Other than
borderline intellectual functioning, Dr. McLendon found "no
indications of any clinically significant psychological
restrictions," no indications of clinical depression or
significant problems related to memory function.[130]

Dr. McLendon completed a medical source statement regarding
Plaintiff's mental ability to perform work-related activities.[131]
He stated that Plaintiff experienced moderate restrictions in her
abilities to understand and remember complex instructions, to carry
out complex instructions, and to make judgments on complex work-
related decisions but no restriction in understanding and
remembering simple instructions, carrying out simple instructions,

---

[127]    See Tr. 1684.

[128]    Tr. 1685.

[129]    Tr. 1686.

[130]    Tr. 1687.

[131]    See Tr. 1678-80.

or making judgments on simple work-related decisions.[132]   Dr.
McLendon identified no other restrictions in her mental abilities
and described Plaintiff's mental RFC in the following words:

> This person has the ability to understand, carry out, and
> remember instructions for one-two step instructions but
> not for complex instructions.  She is not limited with
> regard to her ability to sustain concentration and
> persist in work[-]related activity at a reasonable pace.
> She has a good ability to maintain social interaction
> with supervisors, co-workers, and the public.  She is
> able to deal with the normal pressures in a competitive
> work setting.[133]

**E.   November 2015 Hearing**

At the request of Plaintiff's attorney, the ALJ scheduled a
supplemental hearing on November 13, 2015.[134]   Everyone who had
attended the first hearing returned for the supplemental hearing.[135]

The hearing began with a discussion between the ALJ and
Plaintiff's attorney regarding the reports of the consulting
examiners with particular focus on the finding of borderline
intellectual functioning.[136]  The vocational expert pointed out the
incongruence between Plaintiff's past work experience in skilled
and semi-skilled positions and the recent finding of borderline

---

[132]    See Tr. 1678.

[133]    See Tr. 1687.

[134]    See Tr. 184, 406-11.

[135]    See Tr. 156, 183-204.

[136]    See Tr. 185-86.

intellectual functioning without any type of cognitive disorder.[137] The ALJ explored the inconsistency with Plaintiff and her attorney, settling on the likelihood that she could still perform the teacher's aide position.[138]

The conversation moved to physical RFC with a lively conversation between the ALJ and the attorney regarding Plaintiff's capability for sitting and standing with or without a sit/stand option and then to a discussion about how pain would affect Plaintiff's cognitive functioning.[139] Upon questioning, Plaintiff opined that she could not perform her past work of teacher's aide because of her memory problems and narcolepsy.[140]

Plaintiff's attorney asked the vocational expert whether the following hypothetical individual could perform Plaintiff's past relevant work:

> Say one hypothetical individual, same age, education, and work experience as the claimant.  But I'm going to limit it to light, as defined.   All postural maneuvers are occasional, limited to simple, routine, repetitive.  No work involving math, other than can count[] change would -- that no work involving math level higher than rate -- math level two.
>
> .  .  .  .
>
> From a manipulative standpoint, no overhead reaching, no -- I'm sorry -- only occasional handling with a dominant

---

[137]    See Tr. 187-89.

[138]    See Tr. 189-94.

[139]    See Tr. 194-96.

[140]    See Tr. 196-98.

upper extremity.  No limitation on the non-dominant upper extremity.[141]

The vocational expert testified that the individual would not be able to perform Plaintiff's past relevant work.[142]

The ALJ followed that question by asking whether there would be any jobs that the hypothetical individual could perform.[143]  The vocational expert identified three jobs: assembler, ticket seller, and office helper, which, she said, could be performed by an individual who, in addition to those limitations identified, was unable to work in environments with concentrated exposure to fumes, dust, odors, chemical, or gasses.[144]  However, the vocational expert testified, if the individual missed three workdays a month on average, she could not sustain employment.[145]

## F.  Commissioner's Decision

On December 18, 2015, the ALJ issued an unfavorable decision.[146]  The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 10, 2012, the alleged onset date.[147]  The ALJ recognized the following impairments as

---

[141]   Tr. 200.

[142]   See id.

[143]   See Tr. 201.

[144]   See id.

[145]   See Tr. 202.

[146]   See Tr. 132-47.

[147]   See Tr. 135.

severe: "obstructive sleep apnea; [CTS]; moderate asthma; [COPD];
degenerative disc disease; fibromyalgia; migraine headaches;
narcolepsy; obesity; and borderline intellectual functioning ."[148]
However, the ALJ noted that Plaintiff's high blood pressure "was
generally under good control with medication" and found that
Plaintiff did not meet the requirements of any disorders described
in the listings of the regulations[149] (the "Listings"), specifically
addressing Listings 1.02 (Major Dysfunction of a Joint), 1.04
(Disorders of the Spine), 3.02 (Chronic Respiratory Disorders),
3.03 (Asthma), 3.10[150] (Sleep-Related Breathing Disorders), 12.05
(Intellectual Disorder), and all of the Listings in the category of
Congenital Disorders that Affect Multiple Body Systems.[151]  The ALJ
thoroughly discussed the medical record for all of Plaintiff's
impairments, the medical opinion testimony regarding her RFC, and
Plaintiff's own subjective testimony.[152]

　　　Throughout the decision, the ALJ made several important
findings.  Regarding Plaintiff's ADLs, the ALJ found no
restriction, stating that Plaintiff was "able to perform household

---

[148]　　Id.

[149]　　20 C.F.R. Pt. 404, Subpt. P, App. 1.

[150]　　Listing 3.10 is now reserved.  See 20 C.F.R. Pt. 404, Subpt. P App.
1.  Sleep-related breathing disorders are evaluated under a Listing in the
affected body system.  See Social Security Administration, 78 Fed. Reg. 7968,
7970 (Feb. 4, 2013)(identifying proposed changes to the Respiratory Disorders
Listings).

[151]　　Tr. 140; see also Tr. 135-37.

[152]　　See Tr. 138-45.

chores and prepare meals" and that she was "responsible for her own personal hygiene and grooming activities."[153]   The ALJ also determined that Plaintiff had no deficits in social functioning, stating that no credible evidence indicated that she had difficulty getting along with people.[154]

Based on Plaintiff's answers to questioning at the hearing regarding her scholastic abilities,[155] the ALJ determined that Plaintiff's IQ test result of 73 was "not wholly representative of her intellectual abilities."[156] He noted, however, her ability to perform skilled and semi-skilled work as in the past was "likely compromised somewhat by her chronic fibromyalgia pain and her daytime sleepiness due to sleep apnea and medications."[157]   The ALJ acknowledged that chronic pain likely distracted Plaintiff and caused, along with daytime sleepiness, limitations in her cognitive functioning.[158]

As for Plaintiff's credibility, the ALJ found that her subjective complaints were "not consistent with the medical record

---

[153]   Tr. 137.

[154]   See id.

[155]   For example, Plaintiff stated that she was in regular classes in high school, that she wrote essays and read novels in English class, and that she made primarily As and Bs in her coursework.  See Tr. 190-92.

[156]   Tr. 137.

[157]   Id.

[158]   See Tr. 143-44.

signs and the medical record as a whole."[159]   The ALJ stated that,
although fibromyalgia and degenerative disc disease in combination
cause diffuse joint and back pain, Plaintiff was "still able to
perform household chores and take care of her personal needs
independently."[160]   Thus, the ALJ concluded that Plaintiff's ADLs
supported a finding that she was able to perform a limited range of
light work.[161]

The ALJ gave the physical RFC opinions of Drs. Cremona and
Barnes significant weight and afforded the mental RFC opinion of
Dr. McLendon, whose evaluation the ALJ discussed in detail, great
weight.[162]   Consistent with their opinions except where he imposed
more restrictive limitations, the ALJ found Plaintiff capable of
light work limited to: no reaching overhead; no working in
environments involving exposure to dust, fumes, gases, chemicals,
or other pulmonary irritants or where she would be in close
proximity to dangerous moving machinery or at unprotected heights;
only occasional bending, stooping, or crouching; and occasional
gross handling with right dominant hand, in addition to the mental
limitation of only understanding, remembering, and carrying out

---

[159]    Tr. 139.

[160]    Tr. 142.

[161]    See Tr. 142, 146.

[162]    See Tr. 143-45.  The ALJ afforded Dr. Wallace's opinion less weight
because it was not consistent with Dr. Barnes' more recent evaluation in that Dr.
Wallace did not recognize any cognitive deficits that caused Plaintiff more than
minimal mental functional limitations.  See Tr. 145.

simple, repetitive tasks.[163]   Relying on the vocational expert's responses to the hypothetical questions posed at the hearing, the ALJ found Plaintiff unable to perform her past relevant work but able to perform the jobs of assembler, ticket seller, and office helper.[164]  Therefore, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date to the date of the ALJ's decision.[165]

On February 9, 2016, Plaintiff appealed the ALJ's decision.[166] Plaintiff submitted post-decision medical records from May 2016 and beyond and a largely illegible physician statement by Dr. Russell dated January 6, 2017.[167]  On March 7, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[168] After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[169]

## II.  Standard of Review and Applicable Law

---

[163]    See Tr. 138, 143.

[164]    See Tr. 146.  The ALJ noted that, in posing hypothetical scenarios to the vocational expert, he did not include a limitation against working in close proximity to dangerous machinery or unprotected heights.  See Tr. 138 n.1. The ALJ explained that the limitation was a precautionary limitation that did not affect her ability to perform the identified representation positions.  See id.

[165]    See Tr. 147.

[166]    See Tr. 128.

[167]    See Tr. 10-127.

[168]    See Tr. 1-8.

[169]    See Tr. 3; Doc. 1, Pl.'s Compl.

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

**A.  <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no

matter what the medical findings are; (2) a claimant will
not be found to be disabled unless [s]he has a "severe
impairment;" (3) a claimant whose impairment meets or is
equivalent to [a Listing] will be considered disabled
without the need to consider vocational factors; (4) a
claimant who is capable of performing work that [s]he has
done in the past must be found "not disabled;" and (5) if
the claimant is unable to perform h[er] previous work as
a result of h[er] impairment, then factors such as h[er]
age, education, past work experience, and [RFC] must be
considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20

C.F.R. §§ 404.1520, 416.920.  The analysis stops at any point in

the process upon a finding that the claimant is disabled or not

disabled.  Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is

"that quantum of relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." Carey v. Apfel, 230

F.3d 131, 135 (5th Cir. 2000).  It is "something more than a

scintilla but less than a preponderance."  Id.  The Commissioner

has the responsibility of deciding any conflict in the evidence.

Id.  If the findings of fact contained in the Commissioner's

decision are supported by substantial record evidence, they are

conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings

exist to support the Commissioner's decision should the court

overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir.

1988).  In applying this standard, the court is to review the

entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ erred by: (1) improperly evaluating Plaintiff's credibility; (2) improperly determining Plaintiff's physical RFC; and (3) improperly determining that a significant number of jobs existed in the national economy that Plaintiff could perform.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

Although Plaintiff presents three broad areas in which she contends the ALJ erred, Plaintiff's arguments within each area tend to overlap.  For example, Plaintiff argues that "the record does not support the ALJ's RFC finding[] and thus also does not support his credibility determination."[170]  In order to better address the issues, the court realigns Plaintiff's specific contentions within the broader categories.

### A.  Credibility

---

[170]    Doc. 16, Pl.'s Brief in Support of Mot. for Summ. J. p. 4.

Social Security Ruling ("SSR") 16-3p explains that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2. Even so, an ALJ cannot ignore statements of symptoms but, rather, must evaluate them according to the two-step process set forth in the regulations: (1) consideration of "whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce an individual's symptoms, such as pain;" and (2) evaluation of "the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an [adult's] ability to perform work-related activities. Id. The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if it is supported by substantial record evidence. See Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Here, the ALJ set out the two-step process for evaluating subjective symptoms and followed its mandate. In his decision, the ALJ contrasted, impairment by impairment, Plaintiff's descriptions of pain and functional limitations found in her disability reports and hearing testimony with the medical evidence. For example, the ALJ noted that, according to the medical record, Plaintiff reported "some pain and tingling sensations, but the evidence [did] not show she had any great difficulty with performing handling or fingering

activities [and that] she did experience some improvement with braces, injections, and physical therapy."[171]  The ALJ noted that others of Plaintiff's complaints were inconsistent with diagnostic tests, were controlled by medication, or showed improvement with therapy.  Ultimately, the ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the symptoms she alleged but that the intensity, persistence, and limiting effects that she described were not consistent with "the medical record signs and the medical record as a whole."[172]

Plaintiff takes issue with that finding, contending that her complaints were consistent with all opinions from treating and examining physicians.  However, the medical record belies that contention.  Although Plaintiff's subjective testimony was mostly consistent with her self-reports to treatment providers, it was less consistent with diagnostic criteria as explained by medical providers.  Plaintiff frequently told treatment providers that she suffered from a high degree of pain and presented at appointments with complaints of pain in various body systems, but laboratory and radiological testing did not always reflect a corresponding medical condition that would cause the level of pain claimed.  On examination, Plaintiff routinely demonstrated full strength and normal muscle tone.  Importantly, Plaintiff challenged Dr.

---

[171]    Tr. 140.

[172]    Tr. 139.

Fleming's disability determination, indicating her belief that her complaints were more significant than found by Dr. Fleming and suggested by the medical record.

Because the ALJ followed the two-step process, the ALJ committed no legal error.  Therefore, if supported by substantial evidence, the ALJ's determinations regarding the intensity and persistence of symptoms and the extent to which they limited Plaintiff are entitled to deference.  The court finds that the evidence cited in the ALJ's decision amounts to substantial record evidence in support of his evaluation of Plaintiff's subjective symptoms.

## B.   RFC

A claimant's RFC is her utmost remaining ability to work despite all of her limitations resulting from her impairment.  See Villa, 895 F.2d at 1023; 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairment affects her physical, mental, and other abilities, as well as the total limiting effects of her impairment.  See 20 C.F.R. §§ 404.1545, 416.945.  The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that individual's functional capacity. Cf. Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990)(referring to a diagnosis as only part of the evidence that must be

considered).   The regulations provide that the ultimate responsibility for determining RFC lies with the ALJ. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" and to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at **1, 7). The SSA defined "regular and continuing basis" as eight hours a day, five days a week or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at **1, 2. The Fifth Circuit has explicitly rejected the contention that the ALJ "must in every decision articulate a separate and explicit finding that a claimant can maintain a job on a sustained basis." Castillo v. Barnhart, No. 05-50693, 2005 WL 2675002, at *2 (5th Cir. Oct. 20, 2005)(unpublished)(citing Frank v. Barnhart, 326 F.3d 618, 619 (5th Cir. 2003))("Usually, the issue of whether a claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.").

For separate consideration to be appropriate, the claimant's physical ailment, by its nature, must "wax and wane" in its

manifestation of disabling symptoms.  Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003)(quoting Frank, 326 F.3d at 619).  A separate finding regarding Plaintiff's ability to maintain employment is not necessary "[a]bsent evidence that a claimant's ability to maintain employment would be compromised despite [her] ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC . . . ." Dunbar, 330 F.3d at 672.

Plaintiff argues that she "has ample other limitations that the ALJ should have included in his RFC finding and that are consistent with Plaintiff's testimony."[173]  For example, Plaintiff contends that the SSA recognizes that "obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat."[174]  Be that as it may, a diagnosis of obesity or even the ALJ's recognition of it as a severe impairment does not direct a finding of any or all of the possible limitations associated with obesity.  The ALJ is tasked with determining which of the possible limitations apply to Plaintiff.  In this case, the ALJ discussed obesity, considered its effect on Plaintiff's capability, and

---

[173]   Doc. 16, Pl.'s Brief in Support of Mot. for Summ. J. p. 5.

[174]   Id. p. 11.

included limitations that may be linked to obesity, including those related to lifting, carrying, and walking.

In his thorough decision, the ALJ generously included as severe impairments certain ailments not fully supported by the record and meticulously discerned what limitations Plaintiff experienced as a result. The ALJ even included limitations that theoretically emanated from borderline intellectual functioning even though he found that Plaintiff's scholastic and work backgrounds did not demonstrate that her IQ was in as low a range prior to adulthood or throughout her career. He also included limitations attributable to CTS even though the medical records were equivocal on that diagnosis, as well as limitations attributable to sleepiness even though the records suggested Plaintiff failed to complain of any medication side effects at appointments and failed to obtain a CPAP machine as prescribed.

The ALJ also found that Plaintiff's professed limitations were inconsistent with her written and spoken testimony that she was "able to perform household chores and take care of her personal needs independently."[175] He concluded that Plaintiff's ADLs indicated an ability to perform a limited range of light work. Regarding that conclusion, Plaintiff accuses the ALJ of erroneously substituting "his own lay 'medical' opinion".[176] Clearly, it is not

---

[175]   Tr. 142.

[176]   Doc. 16, Pl.'s Brief in Support of Mot. for Summ. J. p. 5.

40

the ALJ's role to "play[] doctor" by making his own independent medical assessments.   See Frank, 326 F.3d at 622 (stating that "[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong.")(quoting Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990)).   However, reviewing the exertional level of the activities in which a claimant engaged on a daily basis to decide her physical limitations is hardly interpreting medical phenomena.[177]   In fact, that is the ALJ's job, to wit, to review the medical evidence and subjective testimony and to determine what the claimant can do despite her limitations.   See 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a), 416.927(d)(2), 416.945(a).

Plaintiff also disagrees with the ALJ's "selective" recitation of her daily activities, arguing that she "is only able to perform her own personal chores, not those of a whole household[,] that grooming activities such as brushing her teeth and using a comb are difficult for her[,] . . . . [and] that she even has difficulty just going out in public due to her coughing attacks that often develop into vomiting episodes."[178]   In essence, Plaintiff argues that the ALJ put too much emphasis on the daily activities that Plaintiff could perform.   Without legal citation, Plaintiff

---

[177]   In order to support her argument that the ALJ played doctor in finding her capable of light work, Plaintiff appears to be suggesting that the ALJ made a medical determination about how much the diffuse pain from fibromyalgia and degenerative disc disease would limit her physical activity. The court does not subscribe to that tortured reading.   The ALJ simply took Plaintiff at her word about the level of her daily physical activity.

[178]   Doc. 16, Pl.'s Brief in Support of Mot. for Summ. J. p. 6.

contends that the ALJ's duty is to consider a Plaintiff's ability and inability to perform daily activities.

Because the RFC assessment is a determination of what Plaintiff could do despite her limitations, the ALJ's focus was on what Plaintiff was able to do.  Plaintiff simply disagrees with the ALJ's conclusion.  As discussed above, the ALJ separately discussed each impairment and included limitations matching Plaintiff's utmost remaining ability.  For example, Plaintiff's allegations of daytime sleepiness, hand issues, and breathing problems were accounted for in the RFC, particularly in the limitations of simple, repetitive tasks, no overhead reaching, only occasional gross handling activities with her right hand, and no exposure to pulmonary irritants.  Plaintiff required no assistive device to ambulate and, at worst, walked slowly, which was accounted for in finding her only able to perform light work.

Moreover, Plaintiff reported in October 2013 that she assisted her grandchildren's school preparation, performed light cleaning, engaged in ministry work by telephone and letter writing, attended services of her faith community twice weekly, handled personal business matters, fixed lunch, left her residence two to three times a week, shopped once a week, and completed all personal hygiene without difficulty.  The ALJ's RFC determination is more restrictive than the medical experts who reviewed Plaintiff's file at the initial and reconsideration levels of the process and is

fully consistent with Dr. Barnes' June 2015 mental RFC assessment pursuant to examination.

Plaintiff further argues that considering only what she was able to perform said "nothing about Plaintiff's ability to perform a range of light work on a continuous basis."[179]  She asserts that the evidence as to the activities she could perform does not indicate that she was able to perform a limited range of light work on a daily basis over a significant period of time.  Plaintiff contends that, because her symptoms waxed and waned by their very nature, the ALJ should have made a specific finding regarding her ability to maintain employment.

The ALJ need not make a specific finding regarding a claimant's ability to maintain employment, as that consideration is built into the ALJ's RFC determination.  The ALJ cited the proper standard, clearly indicating that he appreciated the factors he was required to consider.  He generally discussed Plaintiff's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, relying primarily on Plaintiff's self-reported daily activities.

Plaintiff argues that her symptoms waxed and waned by their very nature but fails to point to evidence that her ability to maintain employment would be compromised despite the ability to perform employment as an initial matter.  Plaintiff cites to a

_____

[179]    Id. p. 7.

43

single appointment in more than three years of medical treatment at which she reported a fibromyalgia flare so severe that she could not get out of bed.  The only other evidence of waxing and waning the court found in the record is her vague statement in a disability report that the extent to which she was able to pursue daily activities depended on how her body felt on a particular day. These two self-reports are insufficient to suggest that her ability to maintain employment was compromised.

The ALJ's determination that Plaintiff was capable of a limited range of light work is supported by substantial evidence, including both medical records, non-examining and examining physician opinions, and Plaintiff's own testimony.

## C. <u>**Significant Number of Jobs**</u>

After arriving at an RFC that takes "into account all the restrictions reasonably warranted by the evidence," an ALJ may rely on the response of a vocational expert to a hypothetical question on job availability as it relates to a person with the claimant's limitations.  <u>Domingue v. Barnhart</u>, 388 F.3d 462, 463 (5ᵗʰ Cir. 2004).  In order to serve as substantial evidence, the vocational expert's testimony must be based on a hypothetical question that incorporates all of the limitations recognized by the ALJ and must be subject to the claimant's cross-examination.  <u>See</u> <u>Masterson v. Barnhart</u>, 309 F.3d 267, 273-74 (5ᵗʰ Cir. 2002)(citing <u>Boyd v. Apfel</u>, 239 F.3d 698, 707 (5ᵗʰ Cir. 2001).

44

The essence of Plaintiff's arguments in this regard is that, because the ALJ failed to properly evaluate Plaintiff's credibility and omitted limitations from the RFC, the ALJ's conclusion that Plaintiff was not disabled is unsupported.  As explained above, the court finds that the ALJ did not commit any legal error in reaching the credibility and RFC determinations and that those determinations are supported by substantial evidence.  Accordingly, the court finds that the ALJ appropriately applied the legal standards at step five of the process in relying on the vocational expert's response to the posed hypothetical scenarios.   The vocational expert provided a definitive opinion on the Plaintiff's ability to perform the identified jobs, and the ALJ was entitled to rely on the vocational expert's testimony in reaching the conclusion that Plaintiff was not disabled.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

45

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 1<u>st</u> day of June, 2018.

_____
U.S. MAGISTRATE JUDGE